UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ZHIWEN CHEN,

                  Plaintiff,

      -against-                            **MEMORANDUM & ORDER**
                                             07 CV 3698 (DRH) (ETB)

COUNTY OF SUFFOLK, SUFFOLK COUNTY
POLICE DEPARTMENT, POLICE OFFICER SHANE
WILD, POLICE OFFICER RITA D. ENGELS, and
POLICE OFFICER JAMES MAGYAR,

                  Defendants.
------------------------------------------------------------------X

**APPEARANCES**:

**BRIAN P. NEARY, ESQ.**
Attorney for Plaintiff
50 Elm Street
Huntington, NY 11743

**OFFICE OF THE SUFFOLK COUNTY ATTORNEY**
Attorneys for Defendants
100 Veterans Memorial Highway
Hauppauge, NY 11788
By:    Christopher A. Jeffreys, Esq.
        Richard T. Dunne. Esq.

**HURLEY, Senior District Judge:**

        Presently before the Court are the following motions: (1) defendants' motion for

judgment as a matter of law pursuant to Federal Rule of Civil Procedure ("Rule") 50(b) or, in the

alternative, for a new trial under Rule 59; and (2) plaintiff's motion for reasonable attorney's

fees, costs, and interest pursuant to 42 U.S.C. § 1988(b).  For the reasons stated below,

defendants' motion is DENIED in its entirety, and plaintiff's motion is GRANTED, in part.

## BACKGROUND

Plaintiff Zhiwen Chen ("Chen" or "plaintiff") brought this action alleging, *inter alia*, that Police Officers Shane Wild ("Wild"), Rita D. Engels ("Engels"), and James Magyar ("Magyar") (collectively, the "defendants") violated her constitutional rights under the Fourth Amendment when they used excessive force in arresting her on September 6, 2006.[1]  With neither party filing a dispositive motion, the case proceeded to trial, which began on January 10, 2012.  The case was tried before a jury over a period of six days, at the conclusion of which the jury returned a verdict finding defendants Engels and Magyar liable and awarded compensatory damages in the amount of $20,000.00.  With regard to defendant Wild, the jury found him not liable.

At trial, there was a substantial dispute as to the circumstances surrounding plaintiff's arrest.  According to Chen, after she yelled at Magyar for kicking and damaging her front door, he grabbed her by her ponytail, threw her to the ground, and handcuffed her.  Then, she told the jury that Magyar and Engels punched and kicked her all over, including her head and back. (Dunne Aff., Ex. B ("Jan. 12, 2012 Tr.") at 185.)  Chen further testified that during the beating, she was called a "fucking Chinese bitch" accompanied by comment that "we [are] going to teach you how to get along with the neighbors."  (*Id.* at 186.)  Chen also testified that Wild participated in the beating.

Defendants, however, cast the altercation in a different light.  Engels testified at trial that at some point while Magyar and Wild were placing Chen's husband Jihad Haddad ("Haddad") under arrest and walking him to the police car, Chen pushed Engels in an attempt to get past her.

---

[1] While the Complaint contained other causes of action and parties, for reasons which are discussed below, Chen's excessive force claim was the only claim presented to the jury.

Engels claimed that after advising Chen she was under arrest, she began to swing her arms to avoid being handcuffed and lunged towards her front door. In response, Engels testified that she grabbed Chen's clothing and both she and Chen fell to the ground. While on the ground, Engels claimed that Chen began punching and kicking her. Engels testified that while blocking Chen's blows with her arms, she tried to grab Chen's arms to handcuff her. Engels acknowledged landing a single punch which struck Chen in the temple region of the right side of her face. Right after that punch, Engels indicated that she and defendant Magyar, who was now assisting, were able to handcuff her.

According to Magyar, while he was escorting Haddad he heard a commotion and turned to see Chen attacking Engels. In response, Magyar testified that he went to assist Engels, at which point both Engels and Chen were falling to the ground. Magyar stated that he grabbed Chen's legs to stop her from kicking. Additionally, Wild testified that while Haddad was being handcuffed, he saw a struggle taking place between Chen and Engels. Wild indicated that after Chen and Engels fell to the ground, he stayed with Haddad while Magyar went to assist Engels. Wild's testimony about Magyar's involvement in the arrest largely dovetailed with Magyar's. Wild claimed that he was not involved in the use of physical force against Chen.

On January 19, 2012, after the jury had been deliberating for two days, counsel for defendants for the first time broached the subject of submitting a set of interrogatories to the jury concerning qualified immunity, explaining "[i]t just occurred to me as we're sitting here [that] it's something we didn't address and it is raised as a defense." (Neary Decl., Ex. 3 ("Jan. 19, 2012 Tr.") at 27.) That same day, the jury returned its verdict. Immediately following the verdict but prior to the jurors being discharged, defendants made an application to submit

questions to the jury with regard to the qualified immunity issue. (*Id.* at 33-34.) Finding this request untimely under Rule 49(a)(3), the Court denied defendants' application. (*Id.* at 34-40.)

Also subsequent to the verdict, defendants, for the first time, orally moved for judgment as a matter of law pursuant to Rule 50. (*Id.* at 45-47.) Then, on March 19, 2012, defendants filed a motion pursuant to Rule 50(b) seeking an order granting defendants judgment as a matter of law, setting aside the jury's verdict against defendants, and dismissing plaintiff's complaint on the grounds that (1) plaintiff did not prove an injury that is more than *de minimis*; (2) there is no competent evidence that the police officers each used excessive force upon plaintiff; and (3) the police officers are entitled to qualified immunity for their actions. To the extent that judgment as a matter of law is not granted, defendants also seek a new trial pursuant to Rule 59 on the basis that (1) the jury's verdict is against the weight of the evidence; (2) plaintiff materially misrepresented a proffer of evidence concerning non-party witness Martin Newell ("Newell"), which caused the Court to permit improperly prejudicial evidence to be presented to the jury; and (3) the Court improperly failed to provide written questions to the jury pursuant to Rule 49(b).

Finally, on March 27, 2012, Chen, as the prevailing party in an action brought under Section 1983, filed a motion pursuant to 42 U.S.C. § 1988(b) seeking an award of reasonable attorney's fees and costs. In total, plaintiff seeks $169,820.00 in attorney's fees and $4,994.38 in costs.[2]

---

[2] Although plaintiff's moving papers request an award of $146,840.00 in attorney's fees and $4,679.32 in costs, plaintiff requests an additional $22,980.00 in attorney's fees and $315.06 in costs for fees and costs incurred subsequent to the motion being filed.

# DISCUSSION

## I.      Motion for Judgment as a Matter of Law

### A.      Legal Standard

"The standard governing motions for judgment as a matter of law ('JMOL') pursuant to Rule 50, formerly denominated motions for directed verdict or motions for judgment notwithstanding the verdict, is well established." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998) (internal citations omitted). "Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in her favor." *Id.* In considering such a motion, "[a] court 'must give deference to all credibility determinations and reasonable inferences of the jury,' and may not weigh the credibility of witnesses or otherwise consider the weight of the evidence." *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 51 (2d Cir. 2000) (quoting *Galdieri-Ambrosini*, 136 F.3d at 289); *see also This is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998) (noting that the issue on a Rule 50 motion is whether "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached") (internal quotation marks omitted). Therefore, a court should not grant a motion for judgment as a matter of law unless "'there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it].'" *Kinneary v. City of New York*, 601 F.3d 151, 155 (2d Cir. 2010) (alterations in original) (quoting *Brady v. Wal-*

*Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008)).

### B.    Waiver of Rule 50(b) Motion

As explained by the Second Circuit in *McCardle v. Haddad*:

> Under Rule 50(a), a party may move for JMOL during trial at any time prior to the submission of the case to the jury. . . .  After the jury has returned its verdict, Rule 50(b) allows a party to "renew" his motion.  There is no provision for a JMOL motion to be made for the first time after trial.  And even when a preverdict motion for JMOL has been made, the movant may not add new grounds after trial.  The posttrial motion is limited to those grounds that were specifically raised in the prior motion for [JMOL].  In sum, a posttrial motion for JMOL can properly be made only if, and to the extent that, such a motion specifying the same grounds was made prior to the submission of the case to the jury.

131 F.3d 43, 50-51 (2d Cir. 1997) (internal quotation marks and citations omitted).

Where a moving party fails to move for judgment as a matter of law under Rule 50(a) before the case is submitted to the jury, courts in this Circuit routinely deny a Rule 50(b) motion as procedurally improper.  *See, e.g.*, *Ali v. AMG Trucking L.L.C.*, 2011 WL 5184219, at *1 (E.D.N.Y. Oct. 31, 2011) ("Because [plaintiff] did not move under Rule 50(a) for JMOL before submission of his case to the jury, his post-trial Rule 50(b) motion is improper and may be denied on this ground alone."); *Stepski v. M/V Norasia Alya*, 2010 WL 6501652, at *2 (S.D.N.Y. May 7, 2010) ("The Plaintiffs in this case did not move the Court for judgment as a matter of law before the Court submitted the case to the jury.  Accordingly, the Plaintiffs cannot 'renew' their motion pursuant to Fed. R. Civ. P. 50(b), and are not entitled to relief under this rule.")  (internal citation omitted); *Rojas v. Theobald*, 2007 WL 2455133, at *4 (E.D.N.Y. Aug. 23, 2007) ("[I]t is firmly established law that a Rule 50(b) motion will not lie unless it was preceded by a motion for judgment as a matter of law under Rule 50(a) before the case was submitted to the jury.")

6

(internal quotation marks and alteration omitted).

Here, defendants incorrectly state that they moved at trial for judgment as a matter of law pursuant to Rule 50(a), and therefore preserved their right to renew the motion under Rule 50(b). (*See* Defs.' Mem. at 14.) From a review of the record, it is clear that defendants failed to make a Rule 50(a) motion before the case was submitted to the jury. In fact, defendants did not make a Rule 50 motion until *after* the jury returned its verdict. (*See* Jan. 19, 2012 Tr. at 45-46.) Moreover, and contrary to the defendants' contention, the Court did not "dictate[] the procedure under which the Rule 50 motion should be presented in the case at bar." (Defs.' Reply at 1.) After the jury rendered its verdict, defendants' counsel indicated his desire to make a "written application [under Rule 50] within the statutory time rather than do it orally now." (Jan 19, 2012 Tr. at 45.) In response, the Court suggested that counsel make the application orally, and then elaborate in a written submission. (*Id.* at 46.) Prefacing that defendants "intend[] to supplement [their Rule 50 Application] with papers," counsel essentially argued that the evidence did not support a plaintiff's verdict, and that defendants were entitled to qualified immunity. (*Id.* at 46-47.) After counsel presented his arguments, the Court responded that "[t]he issue is framed for present purposes" and that "[t]he motion is deemed made at this point." (*Id.* at 47.) At no point was there a determination that defendants' motion was timely under Rule 50, or that the obligatory procedural requirements set forth in Rule 50 were somehow being waived by the Court.[3]

---

[3] While defendants claim that it is "significant" that plaintiff did not interpose an objection to the timeliness of defendants' Rule 50 motion at trial, they fail to provide any explanation, no less authority, as to the reason that is so. (Defs.' Reply at 1- 2.) In any event, it is defendants' Rule 50(b) motion which plaintiff challenges as untimely, and the fact that defendants did not follow proper procedure prior to making the motion supports this argument.

Finally, defendants' correctly note that even if there was a "technical deficiency . . . the Second Circuit has determined that a District Court may entertain a Rule 50(b) motion even where a Rule 50(a) motion has not been made if it is necessary to prevent manifest injustice." (Defs.' Reply at 2); *see, e.g.*, *Stephenson v. Doe*, 332 F.3d 68, 76 (2d Cir. 2003); *Kirsch* v. *Fleet St., Ltd.*, 148 F.3d 149, 164 (2d Cir. 1998); *Welch v. United Parcel Serv., Inc.*, 871 F. Supp. 2d 164,177-78 (E.D.N.Y. 2012). While what constitutes manifest injustice hinges on the specifics of a particular case, "a defendant may not merely argue that the procedural bar should be waived because they should win on the underlying motion." *Welch*, 871 F. Supp. 2d at 178. As explained below in connection with defendants' Rule 59 motion, the verdict was not against the weight of the evidence, and therefore no manifest injustice will result in denying defendants judgment as a matter of law based on the purported lack of evidence supporting plaintiff's excessive force claim.

Similarly, no manifest injustice will arise in not granting judgment as a matter of law for defendants in connection with their purported entitlement to qualified immunity since this defense was waived altogether. Qualified immunity is an affirmative defense that must be asserted in an answer and proven by the defendant. *McCardle*, 131 F.3d at 50. The defense "can be waived, either by failure to raise it in a timely fashion, or by failure to raise it with sufficient particularity." *Id.* at 51 (internal citations omitted).

From the time the Complaint was filed in September 2007, until the jury began deliberations on January 18, 2012 (a span of over 4 years), defendants can only identify two instances where the defense of qualified immunity was placed before the Court. The first was in the Answer, filed on November 15, 2007, in which defendants assert as their fourteenth

affirmative defense that they acted in good faith because they reasonably believed that they were exercising and acting within their statutory and constitutional powers, and as such, are protected by qualified immunity. (Docket No. 3 ("Answer") ¶¶ 29-32.) The second reference is found in the Joint Pre-Trial Order dated March 31, 2009, which merely indicates that "[t]he individual defendants will contend that they are entitled to judgment in their favor on the basis of qualified immunity." (Docket No. 17 ("Joint Pre-Trial Order") at 4.) Defendants claim that based on the presence of the affirmative defense in these documents, "there can be no surprise that qualified immunity was an issue that had to be decided incident to the trial of this action." (Defs.' Mem. at 19.) Surprise, however, is not the standard when confronted with the question of whether the affirmative defense has been waived. *See McCardle*, 131 F.3d at 51-52; *Blissett v. Coughlin*, 66 F.3d 531, 538 (2d Cir. 1995).

Other than generally pleading the affirmative defense of qualified immunity and indicating in the Joint Pre-Trial Order their intention to argue that they are entitled to judgment on the basis of this affirmative defense, defendants neither addressed the qualified immunity defense prior to trial nor even broached the subject before the case was submitted to the jury for its determination. For instance, not only did defendants not move for judgment as a matter of law on their qualified immunity defense before the verdict was rendered, but they also did not raise the qualified immunity defense in the form of a dispositive motion prior to trial. Moreover, defendants did not propose any jury instructions relating to their qualified immunity defense nor any questions which would ascertain facts necessary to prove such a defense. Also relevant is the fact that defendants did not object to the questions contained in the jury verdict sheet prior to its submission to the jury or request that additional questions be included. Simply put, defendants

have waived the issue of qualified immunity. *Blissett v. Eisensmidt*, 940 F. Supp. 449, 455 (N.D.N.Y. 1996); *accord McCardle*, 131 F.3d at 52.

In urging a contrary conclusion, defendants maintain that "[t]he timing of the defendants' qualified immunity discussion was thoroughly consistent with Second Circuit precedent on the issue, as well as this Honorable Court's prior procedures on issues of qualified immunity." (Defs.' Mem. at 21.) Neither contention is accurate. Taking the latter argument first, defendants allege the following:

> Based upon Judge Hurley's procedure in prior cases involving issues of excessive force and qualified immunity, the issue of excessive force was submitted to the jury for consideration. If the jury returned a verdict in favor of the plaintiff on an excessive force claim, Judge Hurley would decide whether he needed additional questions sent to the jury in order to resolve the issues of qualified immunity.

(*Id.* at 20 n.7.) Although defendants claim that this is the procedure this Court follows when faced with issues of excessive force and qualified immunity, they do not cite to a single case where such a procedure was implemented nor does the Court recall ever proceeding in that fashion. Moreover, it was noted in *this* proceeding that the appropriate way to handle this issue would have been instructing the jury in the charge that, in addition to being called upon to render a general verdict, its role would also involve – should it find a constitutional violation – answering certain factual issues on the verdict sheet pertaining to defendants' qualified immunity defense. (*See* Jan. 19, 2012 Tr. at 34-36.) Since defendants' counsel did not raise the qualified immunity defense until after the jury began deliberations, the opportunity to follow that format never materialized.

As to their claim that Second Circuit precedent supports the timing of their qualified immunity application, defendants maintain that the manner in which a district court should consider qualified immunity issues in excessive force cases was decided by the Second Circuit in *Stephenson*, 332 F.3d at 80-81 as follows:

> The court should charge the jury on excessive force, but not on qualified immunity. If the jury returns a verdict of excessive force against [the defendant police officer], the court should then decide the issue of qualified immunity. We have said that the ultimate legal determination of whether qualified immunity attaches to a law enforcement agent's actions is "a question of law better left for the court to decide."

(quoting *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990)). The above-quoted language, however, does not address the issue of defendants not raising the affirmative defense with the Court until after the case was submitted to the jury. If anything, a closer reading of *Stephenson* only weakens the defendants' position. The procedure which the Second Circuit endorsed in *Stephenson* was one that the district court and parties agreed to after numerous precharge conferences. *Id.* at 80 ("[T]he district court should substantially follow the procedure it outlined, and the parties agreed to, during precharge conferences."). At numerous precharge conferences, questions of whether qualified immunity was available and whether qualified immunity should be charged to the jury were discussed. *Id.* at 73. At one such conference, it was agreed that instead of submitting both the issue of excessive force and qualified immunity simultaneously to the jury, the court would only charge the jury as to excessive force and if the jurors rendered a verdict against the defendant, the district court would go back and ask them specific questions based on the special interrogatories prepared in order to decide the qualified immunity issue. *Id.* at 73-74. Unlike *Stephenson*, there was no discussion, let alone agreement, regarding

11

defendants' qualified immunity defense until after the case was before the jury. As such, defendants cannot support the position that they did not waive their defense of qualified immunity.

Parenthetically, even if the merits of defendants' qualified immunity defense were reached, the Court would not be in a position to find that defendants were entitled to qualified immunity as a matter of law. "The relevant inquiry 'is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* at 78 (quoting *Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)). "Whether a defendant officer's conduct was objectively reasonable is a mixed question of law and fact." *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007). "To the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant to request that the jury be asked the pertinent question." *Id.* at 368. If such a request is not made, a defendant "is not entitled to have the court, in lieu of the jury, make the needed factual finding." *Id.* The conduct of the defendant officers, which is material to the issue of whether they are entitled to qualified immunity, was disputed at trial. While the jury ultimately found that two of the three defendants used excessive force in arresting plaintiff, the verdict does not indicate which purported actions of defendants were believed to have occurred. Since the jury did not answer specific interrogatories that would have made clear the jury's findings on this, and possibly other disputed issues of fact, the Court is unable to find that defendants were entitled to judgment as a matter of law.[4] *See Ellis v. La Vecchia*, 567 F.

---

[4] The defendants' contention that the Court erred in not submitting written questions to the jury pursuant to Rule 49(b) will be addressed *infra*.

Supp. 2d 601, 609 (S.D.N.Y. 2008) ("[B]ecause Defendant failed to request special interrogatories going to the factual issues relating to Plaintiff's malicious prosecution claim, the record is insufficient to permit the Court to make a finding in Defendant's favor on the qualified immunity issue as a matter of law under Rule 50.").

In sum, defendants are not entitled to relief under Rule 50(b) because they failed to (1) move under Rule 50(a) before the case was submitted to the jury, and (2) demonstrate that manifest injustice would result if judgment as a matter of law is not granted in their favor.

## II.  *Motion For a New Trial*

### A.  *Applicable Standard*

Pursuant to Rule 59, a court may grant a new trial "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed R. Civ. P. 59(a)(1)(A).  "'A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'"  *Atkins v. New York City*, 143 F.3d 100, 102 (2d Cir. 1998) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 911 (2d Cir. 1997)).  A new trial may be granted, for example, "if substantial errors were made in admitting or excluding evidence, or in charging the jury, or in misconduct, or because a material issue was improperly submitted or withdrawn from a jury."  *Sharkey v. Lasmo (Aul Ltd.)*, 55 F. Supp. 2d 279, 289 (S.D.N.Y. 1999), *aff'd*, 214 F.3d 371 (2d Cir. 2000); *accord Lidle v. Cirrus Design Corp.*, 278 F.R.D. 325, 327-28 (S.D.N.Y. 2011).

A new trial may also be granted "when the jury's verdict is against the weight of the evidence." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998). "Unlike a motion for judgment as a matter of law, a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict." *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998). In addition, "a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." *DLC Mgmt. Corp.*, 163 F.3d at 133. However, the Second Circuit has cautioned that a court "should only grant such a motion when the jury's verdict is 'egregious'" and "a court should rarely disturb a jury's evaluation of a witness's credibility." *Id.* at 134.

### B.    *Weight of Evidence*

The defendants claim that the evidence adduced at trial does not support an actionable excessive force claim. In particular, it is alleged that plaintiff did not prove that she suffered an injury that is more than *de minimis*, and that there is no competent evidence that defendants used excessive force. While these arguments are presented in the context of defendants' motion for judgment as a matter of law, it has already been determined that defendants are not entitled to such relief. However, since defendants move for a new trial on the basis that the verdict is against the weight of the evidence, these arguments will be considered in the context of a motion for a new trial under Rule 59.

"Police officers' application of force is excessive, in violation of the Fourth Amendment, if it is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (quoting *Graham v. Connor*, 490 U.S. 386, 397, 109 S. Ct. 1865, 104 L. Ed. 2d

14

443 (1989)).  While defendants correctly note that not every push or shove violates the Fourth

Amendment, *see Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973), the Second Circuit has

permitted excessive force claims to stand where the only injury alleged was scrapes, *Maxwell*,

380 F.3d at 109, or bruises, *Robinson v. Via*, 821 F.2d 913, 924-25 (2d Cir. 1987).  In other

words, and contrary to the defendants' suggestion that permanent or severe injury is necessary,

the law of this circuit "does not appear to place a demanding requirement on excessive force

plaintiffs to demonstrate injury." *Felmine v. City of New York*, 2011 WL 4543268, at *19

(E.D.N.Y. Sept. 29, 2011); *see also Robinson*, 821 F.2d at 924 ("If the force used was

unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not

permanent or severe.").

    In this case, Chen and her family testified that the officers repeatedly punched and kicked

her after she was handcuffed.  Although defendants denied the force alleged by Chen, the jury

credited the testimony of Chen and those witnesses which buttressed her testimony.  As such, it

would be improper to grant a new trial under these circumstances as the issue of the force

exercised by defendants was dependent on the assessment of the credibility of the witnesses.  *See*

*DLC Mgmt. Corp.*, 163 F.3d at 134; *Landau*, 155 F.3d at 105.

    As for plaintiff's injuries, x-rays taken the day after the incident confirmed that there were

no fractures.  However, Huntington Hospital records indicated, *inter alia*, that Chen had

abrasions on the left side of her face, her left arm and leg, her wrists and hands, and had bruising

on both of her upper arms and knees. (*See* Neary Decl., Ex. 1.)  Moreover, photographs taken of

Chen a few days after the incident showed multiple bruising.  (*See* Dunne Aff., Ex. C.)  Plaintiff

also testified that she experienced pain for a couple of weeks after the incident.  Based on the

above evidence, coupled with the law in this Circuit, the Court does not find the verdict to be against the weight of the evidence.

### C.    *Testimony of Newell*

Defendants also argue that plaintiff materially misrepresented to the Court the substance of the proposed evidence of non-party witness Newell in order to make his testimony admissible, which caused the Court to permit improperly prejudicial evidence to be presented to the jury. Although defendants maintain that both the purported material misrepresentation and the prejudicial evidence mandate a new trial, the Court finds that neither contention warrants the relief sought.

On January 11, 2012, defendants made an application regarding the anticipated testimony of Newell.  It was the defendants' position that Newell, who is the father of non-party witness Suzanne Downes ("Downes"), was not an actual eyewitness to either Chen's arrest or the degree of force used by the defendant officers during the arrest, and therefore should not be allowed to testify.  (*See* Dunne Aff., Ex. B ("Jan. 11, 2012 Tr.") at 135-36.)  In response to the Court's question "[w]hat relevant information could [Newell] provide concerning the issues before this jury," plaintiff's counsel represented that Newell will contradict the testimony of his daughter Downes in material respects.  (*Id.* at 138-39.)  For example, plaintiff indicated that while Downes claims to be an eyewitness to the incident between plaintiff and the police officers, "[h]er father testified [at his deposition] that he was with her the entire time on their front stoop, and that it was impossible for them to see the incident because there was this very large container box in the driveway" as well as bushes obstructing their view.  (*Id.* at 140-41.)  Based on counsel's representation that the testimony of Newell would be inconsistent, at least in material part, with

that of Downes, the Court accepted counsel's proffer and permitted Newell to testify.[5] (*Id.* at 143-44.)

While defendants argue that plaintiff materially misrepresented the substance of the proposed evidence of Newell during the above exchange on January 11, 2012, the inconsistencies between the in-court testimony of Newell and Downes were not out-of-sync with counsel's representations.[6] And to the extent defendants claim that Newell's testimony should have been limited by the Court to the facts that were mentioned in plaintiff's proffer, no such request was made at the time nor, as discussed *infra*, were any objections interposed at trial to the now additional targeted lines of inquiry.[7]

With regard to the purported racially motivated testimony elicited from Newell, defendants claim that his testimony severely prejudiced defendants to the extent that a new trial is warranted. The testimony at issue includes the following:

_____

[5] There is a typographical error in the trial transcript where it states that "I'm not going to permit this fellow to come in." (Jan. 11, 2012 Tr. at 144.) The Court permitted Newell to testify.

[6] For instance, Downes testified that (1) she saw Haddad being handcuffed right by the front stoop of his house, as well as Chen initiating the physical altercation, (2) nothing obstructed her view of the altercation from her stoop until those involved in the altercation fell to the ground, (3) there was no large container box in her driveway that evening, and (4) her father was not outside with her witnessing the altercation. (*See* Jan. 12, 2012 Tr. at 34-36, 38, 41, 47-49, 51-52, 55, 59-60, 68-70.) While Newell could not remember much about the September 6, 2006 incident at trial, he confirmed the accuracy of his deposition testimony in which he stated that he was outside with his daughter on the stoop when Chen and Haddad were being arrested, and that a large container box in his driveway as well as bushes by plaintiff's house prevented him from seeing anything that transpired on plaintiff's front stoop. (*Id.* at 83-86.)

[7] The one and only objection from defendants to a particular question – as distinct from a line of inquiry – came when plaintiff's counsel was about to refresh Newell's recollection regarding calling his neighbors an Arab man and China woman. In this instance, the Court sustained defendants' objection under Federal Rule of Evidence 403. (*See* Jan 12, 2012 Tr. at 89.)

Q.      At your deposition did you tell me that you thought he was from Asia and he cuts people's heads off like they do in Asia.

A.      No. I said, as far as I remember, that when he came out in the street with his machete and swinging it around, he said he was going to lop our heads off. After that the police were there and they arrested him.

Q.      Did you say that was like they do in Asia?

A.      I said that's what you see on television all the time with the Asians, how they have people bend over and cut their heads off.

Q.      Did you also tell me at your deposition that you did not believe that he was Catholic?

A.      Yes.

Q.      Even though you had been to baptismal parties and seeing the children at their first communion?

A.      I was at his house when his daughter made her first communion, yes. He has all pictures of Khomeni and all those people from Asia hanging up in his house.

(Jan. 12, 2012 Tr. at 80-81.) Defendants also contend that the following inquiry was also severely prejudicial:

Q.      Do you recall during that telephone conversation telling a police officer that, referring to your next door neighbor John as an Arab and Lucy as a China women and telling them they hated the world. Do you recall that?

A.      I don't remember that conversation at all. I don't remember talking to no police officer.

(*Id.* at 88-89.)

The above testimony does not provide defendants with a basis to request a new trial. As an initial matter, in response to plaintiff's inquiries into the racially motivated comments, Newell either denied or could not recall making many of the statements. Moreover, even if it was assumed that Newell's testimony created a bias with the jury, such a bias would have been directed at Downes and her father, neither of whom are defendants in this matter. In any event, defendants did not object to any of plaintiff's questions which they now claim were prejudicial under Federal Rule of Evidence 403. While defendants unsuccessfully objected to Newell being called as a witness based on his purported lack of relevant information, no such objection was made to preclude him from testifying as to the statements at issue. Therefore, defendants present argument, which essentially challenges the admissibility of this evidence, was waived. *See Krieger v. Gold Bond Bldg. Prods.*, 863 F.2d 1091, 1096 (2d Cir. 1988); *see also Robertson v. Sullivan*, 2010 WL 1930658, at *4 (E.D.N.Y. May 12, 2010) (finding argument that the court erroneously admitted testimony "procedurally defaulted" since defendants "failed to object to a good deal of the challenged testimony").

Therefore, neither allowing Newell to testify nor the testimony he elicited at trial provides a basis for a new trial.

### D.     *Written Questions to the Jury*

Finally, defendants maintain that a new trial is warranted because the Court improperly failed to provide written questions to the jury pursuant to Rule 49(b). However, defendants did not request that special interrogatories be submitted to the jury until the second day of deliberations. Once raised, various possible approaches to defendants' belatedly voiced concern were discussed by the Court and counsel. Early-on in those discussions, and well before counsel

had fully expressed their respective positions, the jury returned its verdict. Rather than

discharging the jury at that point, the Court explained:

> Ladies and gentlemen, there is another matter I have to discuss with
> the attorneys so what I'm going to do is ask you to stand by in the jury
> room. I'll address this as quickly as I can. Once it's resolved one
> way or another, we will call you out immediately and tell you where
> we are.

(Neary Decl., Ex. 2 ("Jan. 18, 2012 Tr.") at 32.)

Immediately following the above explanation, oral argument was resumed as to

defendants' application to submit specific interrogatories to the jury regarding their qualified

immunity defense. (*Id.* at 33-34.) When questioned as to the timing of this request, defendants'

counsel maintained that "[i]t can only be done at this point in the trial." (*Id.* at 34.) Finding to

the contrary, the Court quoted the language of Rule 49(a)(3) which states that "[a] party waives

the right to a jury trial on any issue of fact raised by the pleadings or evidence but not submitted

to the jury unless, before the jury retires, the party demands submission to the jury." (*Id.* at 36.)

It was also noted that in the case *Robertson*, which involved a post-verdict request to submit

interrogatories in connection with a qualified immunity defense to an excessive force claim –

Judge Gleeson concluded that "under the express terms of Rule 49(a)(3) any special verdicts not

requested by a party before the jury retires to deliberate are waived." (*Id.*) Based on the

foregoing, the Court ruled that defendants' request to submit interrogatories to the jury after the

jury began deliberations was precluded under Rule 49(a)(3). (*Id.* at 39.)

It appears that defendants now argue that notwithstanding Rule 49(a), the Court had the

authority to submit "written questions" to the jury pursuant to Rule 49(b). Not only was no such

argument presented at trial, but defendants did not object to the verdict sheet that was submitted

to the jury. Nevertheless, even if defendants' request to submit interrogatories was considered under Rule 49(b), it would still be untimely. *Robertson*, 2010 WL 1930658, at *3 ("Even if the requested interrogatories could properly be viewed as a request for written questions under Rule 49(b), the request was untimely. 'The district judge's decision to use interrogatories along with a general verdict, and which interrogatories to submit, ordinarily should be made well before the case is submitted to the jury so that the parties can react to the court's decision.'") (quoting 9B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2512, at 194 (3d ed. 2008)).

Finally, defendants claim that when special interrogatories are not presented to the jury, the issue of qualified immunity is not waived under Rule 49, but rather the Court becomes the necessary fact finder as to those facts bearing on the defense. However, fact finding as to a qualified immunity defense by courts in a jury case, absent consent of the parties, is precisely what the Second Circuit has prohibited. *See Zellner*, 494 F.3d at 368.

For the reasons indicated, defendants are not entitled to a new trial based on their Rule 49 argument.

### III. *Motion for Attorney's Fees*

#### A. *Legal Standard*

In actions under Section 1983, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee" and costs. 42 U.S.C. § 1988(b). Courts in the Second Circuit award attorney's fees "by determining a presumptively reasonable fee, reached by multiplying a reasonable hourly rate by the number of reasonably expended hours." *Bergerson v. N.Y. State Office of Mental Health*, 652 F.3d 277, 289 (2d Cir. 2011); *see also Arbor Hill Concerned*

*Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 183 (2d Cir. 2008). "The presumptively reasonable fee boils down to what a reasonable, paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively." *Simmons v. N.Y.C. Transit Auth*., 575 F.3d 170, 174 (2d Cir. 2008) (internal quotation marks and citation omitted). "The burden is on the party seeking attorney's fees to submit sufficient evidence to support the hours worked and the rates claimed." *Hugee v. Kimso Apartments, LLC*, 852 F. Supp. 2d 281, 298 (E.D.N.Y. 2012) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983)).

### B. Calculation of Hourly Rate

"The reasonable hourly rate is the rate a paying client would be willing to pay." *Arbor Hill*, 522 F.3d at 190. In determining a reasonable hourly rate, the Second Circuit has instructed that a district court "bear in mind *all* of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonably hourly rate." *Id.* (emphasis in original). Such factors may include "the attorney's experience and expertise, the novelty and complexity of the issues presented, and the overall success achieved in the case." *Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d 157, 204 (E.D.N.Y. 2006). Courts in this Circuit also adhere to the "forum rule," which indicates that district courts should generally use the prevailing hourly rates in the district where it sits when deciding the amount of attorney's fees to award. *See Arbor Hill*, 522 F.3d at 191 ("We presume, however, that a reasonable, paying client would in most cases hire counsel from within his district, or at least counsel whose rates are consistent with those charged locally."). Ultimately, the burden is on the prevailing party "to justify the reasonableness of the requested rate." *Blum v. Stenson*, 465 U.S. 886, 895

22

n.11, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984).

In this case, it is plaintiff's position that $400.00 is an appropriate hourly rate for her counsel, Brian P. Neary ("Neary"). Neary supports this request with a declaration describing his education and employment background, as well as the nature of his law practice. The declaration indicates that Neary has been practicing law for twenty-six years, the majority of which was with a small firm on Long Island. (Neary Decl. ¶ 5.) In July 2008, Neary went off on his own as a solo practitioner. (*Id.* ¶ 8.) Neary affirms that 90% of his practice was devoted to litigation and that he has tried approximately twenty cases to verdict. (*Id.* ¶¶ 5, 9.) Finally, Neary states that $400.00 per hour is his current hourly rate. (*Id.* ¶ 16.)

"Recent opinions from the Eastern District of New York have determined that reasonable hourly rates in this district are approximately $300-$450 per hour for partners, $200-300 per hour for senior associates, and $100-$200 per hour for junior associates." *Hugee*, 852 F. Supp. 2d at 298-99 (quoting *Pilitz v. Inc. Vill. of Freeport*, 2011 WL 5825138, at *4 (E.D.N.Y. Nov. 17, 2011)); *see also Konits v. Karahalis*, 409 F. App'x 418, 422–23 (2d Cir. 2011) (adopting the view that the prevailing rates for experienced attorneys in the Eastern District range from $300-$400 per hour). While Neary's proposed hourly rate of $400.00 falls within the acceptable range of hourly rates in the Eastern District for experienced attorneys, that does not mean he is entitled to have an hourly rate of $400.00 applied here. Indeed, after considering case-specific variables applicable to the present circumstances, the Court finds that an hourly rate less than $400.00 is warranted.

One factor supporting an hourly rate below $400.00 is that Neary was a solo practitioner for the overwhelming majority of the case. The only period of time plaintiff's counsel was not a solo practitioner occurred in the first year, where Neary served as a partner to a small firm. While Neary's hourly rate should not automatically be reduced based solely on his status as a solo practitioner, *see Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 143 n.6 (2d Cir. 2007), the size of the firm may be considered in setting a reasonable hourly rate, *see Wong v. Yoo*, 2010 WL 4137532, at *2 (E.D.N.Y. Oct. 19, 2010) (reducing hourly rate as counsel "is a solo practitioner with less overhead and fixed costs than law firm partners"); *Hugee*, 852 F. Supp. 2d at 299 ("The size of the firm may be considered, as large firms tend to charge higher hourly rates than small firms.").

Other factors weighing against an hourly rate of $400.00 include Neary's admission that he had "very limited prior experience in civil rights litigation" and that he had only litigated approximately fifteen cases in federal court, two of which went to trial. (Mar. 26, 2012 Neary Decl. ("Neary Supp. Decl.") ¶¶ 2, 6, 30.) "The highest rates in this district are reserved for expert trial attorneys with extensive experience before the federal bar, who specialize in the practice of civil rights law and are recognized by their peers as leaders and experts in their field." *Hugee*, 852 F. Supp. 2d at 300. While the Court is in no way marginalizing counsel's practice or experience, counsel has nonetheless failed to meet his burden to support the high-end rate requested.

While plaintiff's counsel attempts to support a $400.00 hourly rate by analogizing the circumstances of this case with others in the Eastern District, the cases he relies on do not

support the hourly rate proposed here.[8]  For instance, the plaintiff's counsel in *Wong* was a solo

practitioner with over thirty years of experience, the majority of which was dedicated to civil

rights cases.  2010 WL 4137532, at *2.  Even under those circumstances, the court reduced

counsel's proposed hourly rate of $400.00 to $375.00.  *Id.*  Furthermore, in *Brown v. Starrett*

*City Assocs.*, 2011 WL 5118438, at *5 (E.D.N.Y. Oct. 27, 2011), the court adopted an hourly rate

of $300.00 for an attorney who had been practicing law for twelve years and, in the past seven

years, developed a concentration in civil rights actions.

    Given the relevant factors present in this case, including counsel's expertise, practice, the

lack of complexity involved in the lawsuit, and the recent case law on attorney's fees in the

Eastern District, the Court finds an hourly rate of $350.00 to be reasonable.[9]

### C.    Calculation of Hours Spent

     The prevailing party "bears the burden of . . . documenting the appropriate hours

expended."  *Hensley*, 461 U.S. at 437.  Thus, the application for attorney's fees must be

documented with "contemporaneous time records . . . [that] specify, for each attorney, the date,

the hours expended, and the nature of the work done."  *N.Y. Ass'n for Retarted Children, Inc. v.*

*Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983).  In determining the amount of hours reasonably spent

---

[8] The Southern District of New York cases cited to by plaintiff do not support counsel's proposed hourly rate absent overcoming the presumption in favor of Eastern District rates.  *See Simmons*, 575 F.3d at 172; *see also Wong*, 2010 WL 4137532, at *2 ("[R]ates in the Eastern District are historically lower than rates in the Southern District.").  Here, plaintiff offers no justification for applying rates outside of this forum.  As such, those cases have no relevance to counsel's reasonable hourly rate in this case.

[9] It is well-settled that an attorney's rate for travel time should be half of his hourly fee. *See, e.g.*, *Hugee*, 852 F. Supp. 2d at 302; *Wong*, 2010 WL 4137532, at *2.  Thus, Neary's hourly rate for travel time is set at $175.00 per hour.

on a case, a court must "examine the hours expended by counsel and the value of the work product of the particular expenditures to the client's case." *Gierlinger v. Gleason*, 160 F.3d 858, 876 (2d Cir. 1998) (quoting *DiFilippo v. Morizio*, 759 F.2d 231, 235-36 (2d Cir. 1985)). "In making this examination, the district court does not play the role of an uninformed arbiter but may look to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties." *Id.* If the supporting documentation is inadequate, a court may reduce the award accordingly. *See Hensley*, 461 U.S. at 433. A court may also exclude hours that it views as "excessive, redundant, or otherwise unnecessary." *Bliven v. Hunt*, 579 F.3d 204, 213 (2d Cir. 2009) (quoting *Hensley*, 461 U.S. at 434). Finally, courts have the authority "to make across-the-board percentage cuts in hours as a practical means of trimming fat from a fee application." *Green v. City of New York*, 403 F. App'x 626, 630 (2d Cir. 2010) (quoting *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 237 (2d Cir. 1987)); *see also Luciano v. Olsten Corp.*, 109 F.3d 111, 117 (2d Cir. 1997).

In this case, plaintiff has provided the Court with counsel's contemporaneous hand-written billing records.[10] (*See* Neary Decl., Ex. 2; Neary Supp. Decl., Ex. 2.) In addition to those records, plaintiff provides a typewritten summary of counsel's time, which essentially is a more legible version of counsel's hand-written records. (Neary Decl., Ex. 1; Neary Supp. Decl., Ex. 3.) According to counsel's records, Neary spent a total of 431.05 hours in connection with his

---

[10] Apparently, defendants question the reliability of counsel's billing records in that they do not indicate that they were contemporaneously kept. (*See* Defs.' Mem. at 15.) To the extent there was any question as to how and when Neary kept track of his time, he clarifies such ambiguities in his supplemental declaration. (*See* Neary Supp. Decl. ¶ 23.)

5.5 years of representation of plaintiff.[11]  (Neary Decl. ¶ 33; Neary Supp. Decl. ¶ 32.)  Neary

explains that his time was spent preparing and responding to document and interrogatory

demands, attending eleven depositions, drafting discovery motions, preparing for and conducting

a trial lasting six days, opposing defendants' post-trial motions, and making a motion for

attorney's fees.  (Neary Decl. ¶¶ 26-30; Neary Supp. Decl. ¶ 32.)  In response, defendants claim

that Neary's hours should be reduced in light of (1) the poor result achieved; (2) certain hours not

being related to the federal civil rights claim; and (3) excessive billing.

First, defendants maintain that the attorney's fee award should be reduced in light of the

fact that of the ten claims asserted in the Complaint by Chen and Haddad, Chen was only

successful on a portion of her excessive force claim.  As a starting point, district courts may

exclude hours spent on unsuccessful claims that are severable from the successful claims.  *Green*

*v. Torres*, 361 F.3d 96, 98 (2d Cir. 2004).  However, as a general matter,

> such unrelated claims are unlikely to arise with great frequency.
> Many civil rights cases will present only a single claim.  In other
> cases the plaintiff's claims for relief will involve a common core of
> facts or will be based on related legal theories. Much of counsel's
> time will be devoted generally to the litigation as a whole, making it
> difficult to divide the hours expended on a claim-by-claim basis.
> Such a lawsuit cannot be viewed as a series of discrete claims.

*Hensley*, 461 U.S. at 435.  Where claims are not severable because they "involve a common core

of facts or will be based on related legal theories," *id.*, an attorney's hours may be awarded for

both the successful and unsuccessful claims.  *Green*, 361 F.3d at 98.  While a court *may* award

---

[11] When plaintiff filed her motion for attorney's fees, Neary had billed 373.60 hours to the
file, thirteen of which was for travel.  However, plaintiff seeks compensation for an additional
57.45 hours because Neary had to oppose defendants' motion for judgment as a matter of law
and for a new trial and reply to defendants' opposition to plaintiff's motion for attorney's fees.

fees for both successful and unsuccessful claims, it certainly does not have to compensate for the unsuccessful claims. *See Kassim v. City of Scenectady*, 415 F.3d 246, 255-56 (2d Cir. 2005) (concluding that a district court may still reduce the number of hours by reason of plaintiff's limited success even where claims share a common core of facts); *see also Hensley*, 461 U.S. at 435 (instructing courts to "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation" when claims share a common core of facts). Therefore, while "full fees may be awarded to a partially prevailing plaintiff when the underlying claims are intertwined, the court retains substantial discretion to take into account the specific procedural history and facts of each case." *Green*, 361 F.3d at 99.

The Complaint in this action, which was brought by both Chen and Haddad, set forth ten distinct claims.[12] The following eight claims were alleged by Chen and Haddad: (1) false arrest under the Fourth Amendment; (2) unlawful search under the Fourth Amendment; (3) retaliation under the First Amendment; (4) equal protection based on race; (5) Section 1985 conspiracy; (6) state law false arrest and false imprisonment; (7) negligence; and (8) *Monell* liability against Suffolk County. Chen also asserted claims for excessive force under the Fourth Amendment and state law assault and battery. Despite the number of claims asserted, only Chen's excessive force claim went to trial. And only two of the three defendant officers were found liable.

Because all of the claims arose out of the September 6, 2006 incident, it is difficult to divide the hours expended on a claim-by-claim basis and deduct those hours associated with any unsuccessful claims. However, this inability does not necessarily mean that plaintiff is entitled to

---

[12] While the Complaint contains eleven "counts," two such counts are *Monell* claims against Suffolk County.

be compensated for all the hours counsel expended on the lawsuit as a whole.  It is noteworthy that plaintiff proceeded with all eleven claims right up until trial.  *See Green*, 361 F.3d at 100 ("[T]he District Court had discretion to take into account the fact that plaintiff pled an overbroad case that he had no realistic expectation of ultimately proving in measuring the plaintiff's degree of success.") (internal quotation marks omitted).  While the parties entered into an agreement which mooted the need to move forward on the *Monell* claims, it was decided by Chen, Haddad and their counsel that all other claims, with the exception of Chen's excessive force claim, were not going to be pursued.  *See id.* at 99 (indicating that a district court may consider voluntarily withdrawn claims in determining the overall success achieved).  Because the criminal proceedings against Chen and Haddad did not terminate in their favor, their claims of false arrest and false imprisonment could no longer legally be advanced.  The remaining claims, including all claims asserted by Haddad, were simply abandoned.

Plaintiff's counsel maintains that "defense counsel has not and cannot argue that plaintiff's counsel spent any additional hours working on this case because of the alternative claims asserted in the complaint."  (Pl.'s Reply at 7.)  The burden, however, is not on defendants to disprove the hours asserted; rather, it is plaintiff's burden to submit sufficient evidence to support the hours worked.  The Court is also not convinced that Neary did not spend any additional time working on this matter because Haddad was a plaintiff or because of the alternative claims pled.  By way of one example, while it is true that Haddad would have been a witness to this action regardless of whether he was a named plaintiff, the scope of relevant discovery would have been substantially less if only Chen's excessive force claim was pursued.  After taking the above into account, coupled with the partial success achieved on the sole issue

that went to the jury, the total non-travel hours (418.05) will be reduced by fifteen percent, for a total of 355.3 hours.

Next, defendants challenge plaintiff's claim for attorney's fees related to purely state tort issues and criminal proceedings. This contention is without merit. As an initial matter, defendants incorrectly state that Neary's work on June 23, 2011 and June 24, 2011 pertained to a criminal hearing; the criminal proceedings involving plaintiff and her husband were concluded before June 2011. (Neary Supp. Decl. ¶¶ 20-22.) Instead, the work performed by Neary in June 2011 was in connection with preparing for trial in this civil action, which included an *in limine* motion seeking to preclude defendants from examining a witness about his prior conviction. (*Id.*) As for the time spent by Neary in connection with pursuing state tort claims, that issue has been previously addressed.

Finally, defendants argue that an across the board reduction is appropriate in light of counsel's over-billing and double-billing for reviewing depositions, preparing deposition summaries, and reviewing deposition summaries. In support of this contention, defendants highlight Neary's March 23, 2009 and December 19, 2011 entries. After reviewing counsel's billing records, the Court finds that no reduction is warranted. As Neary correctly notes, "[t]his case turned on credibility and it was crucial for plaintiff's counsel to be intimately familiar with the nuances of each witnesses testimony to adequately prepare for trial." (Pl.'s Reply at 8.) Therefore, it was not unreasonable for Neary to have spent a significant amount of time reviewing and creating deposition summaries in this fact-intensive case. With respect to the specific entries challenged by defendants, Neary adequately explains the basis for his conduct. On March 23, 2009, counsel spent 3.0 hours preparing a summary of defendant Engels'

deposition in order to include deposition designations in the joint pre-trial order. As for the December 19, 2011 entry, Neary spent 3.5 hours reading the deposition summaries of Engels and Magyar in order to prepare for trial. As such, no reduction of hours based on purported excessive billing is warranted.

Multiplying the reasonable hourly rate of $350.00 by 355.3 hours of reasonable time expended totals $124,355.00. After adding $2,275.00 for Neary's travel time ($175.00 x 13 hours), Chen is entitled to $126,630.00 in attorney's fees.

### D.    *Reasonable Expenses*

Finally, plaintiff seeks $4,994.38 in expenses incurred throughout the litigation of this case. (Neary Decl. ¶ 35 & Ex. 3; Neary Supp. Decl. ¶ 33 & Ex. 4.) Courts typically award "those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *LeBlanc–Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998) (quoting *U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 416 (2d Cir. 1989)). Here, the expenses included, *inter alia*, court filing and process server fees, subpoena fees, ordering transcripts, postage, and legal research. These expenses, which defendants do not object to, are adequately documented, and are properly recoverable. Therefore, the full $4,994.38 will be awarded to plaintiff.

**CONCLUSION**

For the reasons set forth above, defendants' motion for judgment as a matter of law or a new trial is DENIED. As for plaintiff's motion for attorney's fees, the motion is GRANTED to the extent that plaintiff is entitled to $131,624.38 in attorney's fees and costs. The Clerk of Court is directed to enter judgment in accordance with the January 19, 2012 verdict and this Memorandum & Order.

**SO ORDERED.**

Dated: Central Islip, New York
March 7, 2013

_____/s/_____
Denis R. Hurley
United States District Judge